**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.**  1:23-cv-6005 |
| **CELSIUS NETWORK LIMITED and ALEXANDER "ALEX" MASHINSKY,** | **Jury Trial Demanded** |
| **Defendants.** | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") alleges as follows:

## SUMMARY OF ACTION

1.      From March 2018 through June 2022, Defendants Celsius Network Limited ("Celsius") and its founder and CEO Alexander "Alex" Mashinsky ("Mashinsky") raised billions of dollars from investors through unregistered and fraudulent offers and sales of crypto asset securities.  Defendants falsely promised investors a safe investment with high returns through its "Earn Interest Program," they misled investors about the financial success of Celsius's business, and they fraudulently manipulated the price of Celsius's own crypto asset security—the so-called "CEL" token.  Defendants' scheme unraveled in June 2022, leaving investors unable to withdraw billions of dollars in crypto assets from Celsius's online platform.  Celsius filed for bankruptcy a month later, stating that the company's liabilities exceeded its assets by approximately $1.2 billion.

2.      Mashinsky founded Celsius in 2018.  The company claimed it was an alternative to traditional financial institutions and would provide investors who held crypto assets "financial freedom" and "economic opportunity."  Defendants promoted the Celsius platform as offering

safe investment opportunities for retail investors to earn interest on their crypto assets, and the company claimed to generate revenue by lending and investing crypto assets.

3.      Celsius marketed two core investment opportunities to investors.  First, Celsius offered and sold its own crypto asset security, CEL.  Defendants promised high "earning rates" to investors who purchased CEL and marketed CEL as an investment in the success of Celsius itself.  Second, Celsius offered an Earn Interest Program whereby investors tendered their crypto assets to Celsius in exchange for interest payments.  Defendants promised investors in the Earn Interest Program returns as high as 17%.  Defendants never filed a registration statement for their offers and sales of the Earn Interest Program, however, and no exemption from registration was available.

4.      Defendants made numerous false and misleading statements to induce investors to purchase CEL and invest in the Earn Interest Program.  Among other false representations, Defendants misrepresented Celsius's central business model and the risks to investors by claiming that Celsius did not make uncollateralized loans, the company did not engage in risky trading, and the interest paid to investors represented 80% of the company's revenue.

5.      None of these claims was true.  Celsius could not consistently generate the revenue needed to make the required interest payments to investors with respect to the Earn Interest Program.  The company engaged in risky trading practices and made uncollateralized loans to try to generate the necessary revenue, putting the entire Celsius enterprise at grave risk. Celsius was unsuccessful and, as a result, frequently paid much more than 80% of its revenue to satisfy the company's interest payment obligations—a business practice that was hidden from investors, unsustainable, and ultimately led to the company's collapse.

6.      Defendants also misrepresented Celsius's financial success to make the company

appear more profitable and stable than it was (and, therefore, CEL to be a more attractive and safe investment than it really was). For example, Defendants claimed that the company raised $50 million from its so-called initial coin offering ("ICO") of CEL. In reality, Celsius raised less than 65% of the amount it had been trying to raise. To make up the shortfall, Mashinsky secretly sought to purchase the unsold $18 million in CEL himself through an undisclosed transaction with Celsius. Defendants never consummated the deal, however, and, contrary to Mashinsky's representation to the public, the outstanding CEL remained unsold.

7.      Defendants also falsely claimed that Celsius had 1 million active users on Celsius's platform. It did not. Celsius's own internal data—which was regularly shared with Mashinsky—showed that the company only had approximately 500,000 users who had ever deposited crypto assets on the company's platform and that many were no longer active users.

8.      In addition, Defendants falsely stated that Celsius had not experienced any institutional loan defaults. In fact, Celsius and Mashinsky knew that the company had experienced defaults by institutional borrowers totaling hundreds of millions of dollars.

9.      Defendants also misrepresented the safety of investor assets deposited on Celsius's platform. Defendants claimed that Celsius had received approval from state and federal regulators for its business even though they knew the company had not. Defendants also falsely portrayed investor assets as being insured, knowing the company had no such insurance.

10.      In addition to making numerous false statements about Celsius's business, Defendants also manipulated the market for CEL. Defendants publicly touted a "buy back" program whereby Celsius purchased the amount of CEL needed to make interest payments to investors. In reality, Celsius bought, at Mashinsky's direction, millions of dollars of additional CEL to bolster the price of CEL and induce investors to buy it. Defendants timed their CEL

purchases to have the greatest market impact.  At the same time, Celsius and Mashinsky reaped

millions of dollars in profits for themselves from sales of CEL.

11.     By 2022, Celsius's business was unsustainable, and it became clear internally that

the company would fail.  One employee called Celsius a "sinking ship," while another wrote that

"there is no hope . . . there is no plan" and that Celsius's business model "is fundamentally

broken."  On May 21, 2022, a Celsius executive candidly acknowledged in an internal message:

"We don't have any profitable services."

12.     A report that circulated among Celsius's executives, including Mashinsky,

reached the same conclusion.  The report began:  "Celsius has been consistently losing money

and is facing an erosion in the capital position as well as liquidity constraints.  The current

business model is not financially sustainable."  In fact, Celsius had incurred losses of more than

$800 million in 2021 and an additional $165 million during the first quarter of 2022.

13.     Even though they knew that Celsius was failing, Defendants continued to tell the

investing public a very different story.  In May 2022, Celsius claimed that it "abides by robust

risk management frameworks," that "[a]ll user funds are safe," and that it "continue[s] to be open

for business as usual."  Mashinsky asserted that "Celsius has not experienced any significant

losses and funds are safe."  On June 10, 2022, Mashinsky sought to reassure investors further by

claiming that Celsius has "billions in liquidity."  Two days later, however, Celsius stopped

allowing investors to withdraw crypto assets from its platform, and the company filed for

bankruptcy the next month.

14.     By engaging in the conduct alleged in this Complaint, Defendants violated

Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C.

§§ 77e(a), 77e(c), 77q(a)]; Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934

("Exchange Act") [15 U.S.C. §§ 78i(a)(2), 78j(b)]; and Rule 10b-5 thereunder [17 C.F.R.

§ 240.10b-5]. Defendants will continue to violate the federal securities laws unless they are

restrained and enjoined by this Court.

## JURISDICTION AND VENUE

15.     The SEC brings this action pursuant to Sections 20 and 22 of the Securities Act [15

U.S.C. §§ 77t, 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e)]

to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business

alleged in this Complaint, and transactions, acts, practices, and courses of business of similar

purport and object. The SEC also seeks against Mashinsky civil penalties, disgorgement of his ill-

gotten gains plus prejudgment interest, an officer and director bar, and a conduct-based injunction

that prohibits him from (i) participating, directly or indirectly, in the purchase, offer, or sale of any

crypto asset securities, or (ii) engaging in activities for the purposes of inducing or attempting to

induce the purchase, offer, or sale of any crypto asset securities by others.

16.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities

Act [15 U.S.C. § 77v], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d),

78u(e), 78aa], and 28 U.S.C. § 1331.

17.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1391.

18.     Defendants, directly and indirectly, made use of the mails, and the means and

instrumentalities of interstate commerce, in connection with the transactions, acts, practices, and

courses of business alleged in this Complaint.

19.     Certain of the transactions, acts, practices, and courses of business constituting

violations of the Securities Act and the Exchange Act occurred in this District. For example,

Defendants made materially false and misleading statements in this District regarding CEL and the Earn Interest Program, and Defendants offered and sold CEL and the Earn Interest Program to investors who reside in this District.  Investors in the United States, including this District, were able to invest in the various investment opportunities available on the Celsius platform through Celsius's website and mobile application.  In addition, Mashinsky resides in this District, and he and Celsius regularly conducted business in this District.

## DEFENDANTS

20.     Celsius Network Ltd. is a United Kingdom registered company that served as the primary company involved with most investor services and activities related to CEL and the Earn Interest Program.  The company's principal place of business is Hoboken, New Jersey, and it regularly conducted business in New York, NY.  Celsius is the parent of various operating subsidiary companies, including U.S. entities.  Celsius is itself the subsidiary of Celsius Network Inc., a Delaware corporation that is the holding company for all Celsius entities.

21.     Alexander "Alex" Mashinsky, age 57, is the Co-Founder and former Chief Executive Officer of Celsius.  Mashinsky resides in New York, NY, where he ran Celsius and frequently conducted business on its behalf until he was asked to resign from the company and did so on September 27, 2022.  Mashinsky has an 83.7% equity stake in Celsius Network Inc., which is the majority owner of Celsius.

## BACKGROUND ON SECURITIES OFFERINGS

22.     Congress enacted the Securities Act nearly a century ago to regulate the offer and sale of securities.  In contrast to the commercial principle of *caveat emptor*, Congress established a regime of full and fair disclosure, requiring those who offer and sell securities to the investing public to provide sufficient and accurate information to allow investors to make informed

decisions before they invest.

23.     Sections 5(a) and 5(c) of the Securities Act require issuers of securities like
Celsius to register offers and sales of those securities with the SEC when they offer and sell
securities to the public.  Registration statements relating to an offering of securities provide
investors with important information about the issuer and the offering, including financial and
managerial information, how the issuer will use offering proceeds, and the risks and trends that
affect the enterprise and an investment in its securities.

24.     The Securities Act and Exchange Act also contain anti-fraud provisions to prevent
fraudulent conduct in the offer, sale, and purchase of securities.  Section 17(a) of the Securities
Act and Section 10(b) of the Exchange Act, for example, seek to ensure honest behavior and fair
dealing in securities transactions.

25.     Congress used a broad definition of "security" in the Securities Act and Exchange
Act.  A "security" encompasses a wide range of investments, including investment contracts.
Investment contracts are instruments through which a person invests money in a common
enterprise and reasonably expects profits or returns derived from the entrepreneurial or
managerial efforts of others.  In this case, Celsius offered and sold CEL and the Earn Interest
Program as securities.

## BACKGROUND ON CRYPTO ASSETS

26.     The term "crypto asset" generally refers to an asset issued and/or transferred using
distributed ledger or blockchain technology, including assets sometimes referred to as
"cryptocurrencies," "digital assets," "virtual currencies," "digital coins," and "digital tokens."

27.     A blockchain or distributed ledger is a peer-to-peer database spread across a
network of computers that records all transactions in theoretically unchangeable, digitally

recorded data packages.  The system relies on cryptographic techniques for secure recording of transactions.

28.     Blockchains typically employ a consensus mechanism to "validate" transactions, which, among other things, aims to achieve agreement on a data value or on the state of the ledger.  Crypto assets may be traded on crypto asset trading platforms in exchange for other crypto assets or fiat currency (legal tender issued by a country).

29.     A blockchain "protocol" is a code, software, or algorithm that governs how a blockchain, or a feature of a blockchain, operates.

30.     On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934:  The DAO*, advising "those who would use . . . distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws," and finding that the offering of crypto assets at issue in that report were offered and sold as investment contracts and, thus, securities.

## FACTS

**I.**     **Mashinsky Launches Celsius and Claims to Provide "Financial Freedom" and "Economic Opportunity" to Investors**

31.     Mashinsky and another individual founded Celsius in 2018.

32.     Mashinsky marketed Celsius as an alternative to traditional financial institutions—a place for retail investors to earn interest on their crypto assets invested on Celsius's platform.  Celsius and Mashinsky publicized that investors could "unbank" themselves and enjoy "financial freedom" as part of the Celsius community.

33.     Celsius promoted itself as an altruistic organization and referred to its investors as "Celsians."  Celsius stated in a blog post:  "Can we really bring unprecedented financial freedom, economic opportunity and income equality to everyone in the world?  We are Celsius.

8

We dream big."

34.     Mashinsky was the CEO, public face, and primary promoter of Celsius.

35.     Mashinsky frequently spoke about and on behalf of Celsius on social media platforms like Twitter, in interviews, podcasts, live television appearances, and in articles circulated on the internet.

36.     Inside Celsius, Mashinsky actively participated in discussions regarding all aspects of the company's business and also dictated many of the company's business decisions.

37.     Mashinsky was also a member of Celsius's Executive Committee ("EXCO"), Risk Committee, Asset-Liability Committee ("ALCO"), Investment Committee, and Deployment Committee.  Each of these committees met regularly to discuss certain high-level aspects of Celsius's business, strategy, and financial condition.

38.     Since being founded in 2018, Celsius grew quickly in terms of headcount, assets on its balance sheet, and number of users.  From 2018 to 2022, the company went from having only a handful of employees to approximately 900 employees.  From 2018 until November 2021, Celsius went from having $49.8 million of assets to having $28.6 billion of assets on its balance sheet.  By March 2022, Celsius had approximately 285,000 active users.

## II.     Celsius's Core Investments:  the CEL Token and Earn Interest Program

### A.     Celsius Offers and Sells CEL

39.     In March 2018, Celsius conducted an offer and sale of its own crypto asset security in a so-called "ICO."  Celsius created and called the crypto asset security "CEL."

40.     Celsius initially offered CEL at $0.30 per token with a cap of $50 million to be raised from the sale of CEL.

41.     All CEL tokens were fungible with each other, meaning that buying one unit of

one CEL token did not entitle investors to any separately managed accounts.  Instead, all CEL tokens changed in price together, such that an investor's returns were directly proportional to the amount of CEL purchased.

42.     Accredited investors in the United States could purchase and sell CEL directly from and to Celsius through the company's over-the-counter desk ("OTC").  Investors were later able to buy and sell CEL on the secondary market through various crypto asset trading platforms, and they did so.

43.     According to Celsius's OTC Policies and Procedures, "To comply with CEL tokens status as a security with the SEC, all US purchases via OTC must be locked for 1-year within their wallet immediately after settlement."

44.     The price of CEL fluctuated significantly over time, ranging from a low of $0.03 per token in January 2019 to a high of $8.02 per token in June 2021.

45.     Since the founding of Celsius, CEL played a critical role in the company.  In a March 2018 white paper, Celsius described CEL as "the backbone of the Celsius Network." CEL was a token that unlocked discounts and features on Celsius's platform, such that the greater the number of people who wanted to use the platform, the higher the demand would be for CEL.

46.     On March 8, 2018, Mashinsky further explained in a livestreamed event:  "We are focused on enabling the community, on creating a large community because everything we do is measured by the [CEL] token."  Mashinsky went on to say:  "The token price goes up, our entire compensation is the token. So our job is to do everything we can to increase the price of the token as long as it's in the best interest of the community."

47.     Mashinsky also publicly described the price of CEL as a measure "of the

profitability or how well is Celsius doing." In other words, the price of CEL would increase when Celsius successfully attracted more users, and the price of CEL would decrease when the demand for Celsius's investment services declined.

48. Consistent with their public statements, Mashinsky and others at Celsius viewed CEL as comparable to stock in a public company. Mashinsky wrote in an internal message that he wanted "to be able to talk about CEL just like public companies talk about their stock."

49. The fortunes of CEL purchasers were tied to one another, as well as to Celsius's and Mashinsky's fortunes with respect to CEL. Mashinsky and other Celsius executives received CEL as part of the ICO and as part of their compensation. Celsius's founders were allocated over 100 million CEL, and compensation for Mashinsky and Celsius's employees was partially tied to the price of CEL, with bonuses triggering when CEL reached certain price thresholds. As a result, the better CEL performed, the more Mashinsky and Celsius employees benefitted financially as well.

50. In fact, Celsius was the largest holder of CEL, and the company controlled over half the supply of available CEL through its corporate Treasury. After Celsius, Mashinsky was the second largest holder of CEL.

51. Celsius controlled how funds received from the sale of CEL were used. Celsius pooled proceeds from the sale of CEL, both in the ICO and in later CEL sales, for general use in its business, including funding the development of its infrastructure and related capital costs.

52. Celsius and Mashinsky publicly promoted CEL as an investment on which investors could profit based on Celsius's efforts. The company's white paper touted that investors could earn interest and rewards by purchasing CEL. Celsius and Mashinsky also marketed CEL as a profitable asset growing in value. On Twitter, they advertised the percentage

price increase in CEL.  Celsius also publicized whenever CEL was listed on a new crypto asset trading platform where it could be traded for other assets.

53.    Celsius also publicized the profitability of CEL based on its management team's efforts—tying CEL's price to Celsius's success.  The white paper highlighted the management team's entrepreneurial experience and success in creating profitable businesses.

54.    Mashinsky similarly publicly emphasized the profitability of CEL based on the efforts of Celsius and its management team, saying in a January 12, 2022 livestream event:

> We believe that the token has not shown its full potential yet. A lot of it is on us . . . we are launching big things this year, and obviously these things are going to have major, major impact on the price of CEL.

55.    Celsius and Mashinsky also publicly touted how much investors could earn by investing in CEL (e.g., "CEL is earning 5.25% APR").  They also encouraged investors to purchase and hold onto CEL with the expectation that its value would increase, using marketing phrases like "HODL" (an acronym used in the crypto industry meaning "hold on for dear life") and "to the moon" (a reference to a rising price).

56.    Celsius also touted on its website the "higher earning rates" investors could earn:



57.     Mashinsky also regularly highlighted the financial performance of CEL, including tweeting links to performance charts and news articles, while noting the increase in CEL's price.

58.     For example, in June 2020, Mashinsky tweeted that CEL had increased in value by 364% during the last three months and it was at an all-time high.  In December 2021, Mashinsky tweeted:  "CEL Rallies by 15% Following Celsius Network's Latest Award."  He included a link to an article touting the increase in the price of CEL during that month.

59.     In other words, Defendants told investors they would earn returns as a result of the company's efforts by the price of CEL increasing and through interest payments.

**B.     Celsius's Earn Interest Program**

60.     From around June 2018 until it paused withdrawals in June 2022, Celsius offered and sold interests in the Earn Interest Program to investors in the United States and elsewhere.

61.     To invest in the Earn Interest Program, investors tendered crypto assets to Celsius in exchange for Celsius's promise to provide investors periodic interest payments proportional to their investments in the program.  Celsius called these interest payments "rewards."

62.     The crypto assets tendered to Celsius through the Earn Interest Program were not subject to a lock-up period and investors could retrieve their assets from Celsius on demand.

63.     The investor assets tendered to Celsius through the Earn Interest Program were for the company's general use in its business, which produced income for Celsius and which Celsius indicated would generate returns for its investors.

64.     Celsius pooled the assets received from investors in the Earn Interest Program together with other Celsius assets and exercised full discretion and control over how the pooled assets were used.  Celsius deployed the assets it received through the Earn Interest Program into the same revenue-generating activities (e.g., lending), and the company paid returns to investors

in the Earn Interest Program on a *pro rata* basis on their investment.

65.     The Terms of Use for Celsius provided the following:

ALL DIGITAL ASSETS TRANSFERRED TO CELSIUS AS PART OF THE
SERVICES ARE OWNED AND HELD BY CELSIUS FOR ITS OWN ACCOUNT
. . . AND UNDER NO CIRCUMSTANCES DOES CELSIUS HOLD ITS
DIGITAL ASSETS ON YOUR BEHALF AS PART OF THE SERVICES.

66.     Celsius's Terms of Use also contained the following disclosure:

We may lend, sell, pledge, hypothecate, assign, invest, use, commingle or otherwise
dispose of assets and Eligible Digital Assets to counterparties or hold the Eligible
Digital Assets with counterparties, and we will use our best commercial and
operational efforts to prevent losses.

67.     Celsius marketed the Earn Interest Program to U.S. investors through general

solicitations on the company's website, mobile application, and on social media sites.

68.     Celsius publicized that investing in the Earn Interest Program was easy and a

passive way for investors to earn returns.

69.     In response to a CNBC reporter's question about whether it was "difficult" for a

"regular investor" to invest in the Earn Interest Program, Mashinsky stated:  "No, it's pretty

simple.  You download the Celsius Network app or you can also register on our website.  And

you have to move over your crypto assets.  We only accept crypto assets.  And you earn yield

automatically."  Mashinsky went on to say:  "You don't have to do anything.  All you do is you

put the assets in and every Monday you get yield in your account.  You don't have to do

[anything], we do all the hard work."

70.     Celsius promoted the Earn Interest Program as a profit-making opportunity,

including emails with phrases like "Pour Yourself a Cup of Profits" and "Profits in your Pocket."

71.     Mashinsky also marketed the Earn Interest Program through frequent social media

postings on his Twitter account and in livestreamed personal appearances.

14

72.     On its website, Celsius promised investors returns of up to 17% on the crypto

assets they invested in the Earn Interest Program:



73.     Celsius specifically invited investors to expect that any profits earned would come

from Celsius's efforts, stating on its website:  "The Celsius finance team generates returns for

our community by lending out our community's digital assets to institutional and retail

borrowers.  We aim to return up to 80% of the revenues made from lending out our community's

assets back to our community on a weekly basis.  Due to the rate of returns we can achieve in the

lending market change nearly every day [sic], we adjust the rates that our community earns on

their digital assets on a weekly basis."

74.     Celsius also wrote on its website:  "Weekly rewards are calculated every Friday at

05:00:00 UTC, according to prices at that moment.  That means that our rates change on a

weekly basis depending on the current market conditions."

75.     Celsius emphasized on its website that up to 80% of the company's revenue is paid back to investors:



76.     Mashinsky elaborated on the concept that investor returns would come from Celsius's managerial and entrepreneurial efforts in an online interview with Forbes on May 4, 2020, that was posted to Celsius's website:  "Celsius Network goes out to find the best yield for your asset with the lowest risk and then delivers 80% of the value created back to the user[.]" Mashinsky went on to say:  "I turn back the majority of my profits to my depositors" and "we share 80% of these revenues with our customers."

77.     Mashinsky similarly stated in an interview posted on YouTube on April 13, 2022: "[W]e give most of the profits or most of the yield back to the community.  So Celsius, as an example, has paid the community over $1 billion in yield."

78.     In other words, the more revenue Celsius generated from investor funds though its managerial efforts, the greater the returns would be for investors in the Earn Interest Program.

79.     Celsius accepted crypto assets from any investor willing to sign up for the Earn Interest Program.

80.     The high returns Celsius promised made the Earn Interest Program attractive to retail investors.  In a March 18, 2020 interview with Cointelegraph, Mashinsky noted that "about 90% of the deposits come from the retail clients."

81.     The value of crypto assets that investors invested in the Earn Interest Program is staggering.  As of August 22, 2021, Earn Interest Program balances equaled more than $13 billion.

82.     Celsius and Mashinsky never filed a registration statement or had one in effect with the SEC for their offers and sales of securities through the Earn Interest Program.

83.     Celsius's public disclosures regarding the Earn Interest Program contained limited or inadequate information about Celsius's operations, financial condition, liquidity, and other factors relevant in considering whether to invest in the Earn Interest Program.

### III.     Defendants Defrauded Investors Who Invested in CEL or in the Earn Interest Program

84.     Celsius told the investing public that it generated revenue to pay investors by lending the "community's assets to safe institutions looking to borrow coins."  Celsius also emphasized that its Earn Interest Program was a way for retail investors to obtain "high yield at a low risk."

85.     The reality was much different.  Celsius and Mashinsky deployed investor assets in a variety of ways—many of which were much riskier than institutional lending—including directional trading (trading that bets on the value of an asset or security going up or down), providing liquidity on certain so-called DeFi platforms, staking crypto assets with respect to certain blockchain protocols, and funding crypto asset mining activities.

86.     Celsius needed and relied upon revenue generated from these activities to fund interest payments to investors in the Earn Interest Program and to generate income for the

company such that the riskier these activities, the riskier the Earn Interest Program investment became to unknowing investors.

87.     At the same time, Celsius and Mashinsky engaged in a concerted campaign to persuade investors to purchase CEL and invest in the Earn Interest Program.

88.     Celsius and Mashinsky frequently posted information on social media sites such as Twitter, Facebook, and Instagram, as well as on other online platforms like LinkedIn.

89.     Mashinsky also communicated regularly with the investing public through weekly livestreamed events called "Ask Mashinsky Anything" ("AMAs").  Each of these so-called AMA events was viewed, on average, by a thousand to several thousand individuals.

90.     Celsius would then upload a recording of each AMA episode onto YouTube, where an additional ten to fifteen thousand viewers, on average, watched the AMA.

91.     Mashinsky began regularly holding these AMAs in April 2020, and they continued until June 2022.

92.     Celsius and Mashinsky marketed the AMAs extensively on social media channels, and Mashinsky and others at Celsius viewed these episodes as a key way to obtain and retain investors in CEL and the Earn Interest Program.

93.     The AMAs were effective at reaching a large audience, but they also frequently included false or misleading statements, including many of the statements discussed below.

94.     By around May 2021, Mashinsky's public misrepresentations about CEL and the Earn Interest Program were so pervasive and, as Celsius employees recognized, so problematic that Celsius put in place a process to remove certain statements from the AMA episodes before they were posted on Celsius's YouTube channel.  This editing process (the "AMA Editing Process") occurred, however, only after the videos had aired live.

18

95.     Celsius did not publicly correct the false or misleading statements for those who watched the live AMAs, nor did it disclose that this editing process existed.  In addition, the AMA Editing Process was limited to contemporaneous AMAs produced and livestreamed by Celsius.  The company did not have the ability to edit other statements Mashinsky made to the public via third parties, including Twitter Spaces or news outlets.

96.     Although Mashinsky was not directly involved in the AMA Editing Process, he was aware that it existed, and Celsius employees told him that certain statements he made during the AMAs were not accurate.

**A.      Defendants Misrepresented Celsius's Central Business Model and the Risks to Investors**

97.     Celsius and Mashinsky repeatedly promoted Celsius as a community-based company focused on a simple and safe business model.  In reality, their representations about core aspects of Celsius's business were materially false and misleading.

**1.      Celsius and Mashinsky Falsely Represented That Celsius Did Not Make Uncollateralized Loans with Investor Assets**

98.     A central tenet of Celsius's promotion of its business was that it did not make uncollateralized loans when deploying investor funds from the Earn Interest Program.  Celsius and Mashinsky made this representation frequently and in numerous different outlets.  For example, in a November 26, 2019 livestreamed event, Mashinsky said:  "I can tell you there are other lenders in the market who lend with no collateral or lend to anybody.  Good.  Good for them.  We will never do that."

99.     Mashinsky made the same false claim in a March 13, 2020 "Crypto Market Commentary with Alex Mashinsky" video:  "Credit goes to the Finance Department, Credit Risk

management for not lending to risky institutions or risky hedge funds.  We stick with the highest quality, we don't do non-collateralized loans, we always have collateral."

100.    In an April 14, 2020 video, Mashinsky similarly stated:  "For us, I mean, we are – there are crazy guys out there that lend with no collateral.  We don't do that, so, we have very tight controls."

101.    Mashinsky also reiterated the point in a July 17, 2020 AMA:  "Celsius does not do non-collateralized loans" because "that would be taking too much risk on [customers'] behalf."

102.    Mashinsky continued making similar false statements through 2022.  In a January 7, 2022 interview with RealVision Finance, Mashinsky stated:  "We don't do uncollateralized lending . . . . Obviously, we only do asset backed lending."  Mashinsky reiterated in an April 13, 2022 interview with CNBC:  "[W]e do not offer any non-collateralized loans."

103.    In reality, despite the numerous public assurances to the contrary, Celsius made many uncollateralized institutional loans totaling millions of dollars.  In fact, in November 2019, Celsius had more than $17 million in uncollateralized institutional loans.

104.    Throughout 2020, the percentage of Celsius's institutional loan book that was uncollateralized consistently increased.  It went from 16.27% in the first quarter to 26.4% in the second quarter.  By the third quarter, 28.4% of Celsius's institutional loans were uncollateralized, and by the fourth quarter the percentage had increased to 31.33%.

105.    By the second quarter of 2021, the percentage of uncollateralized institutional loans held by Celsius had ballooned to 38%.  These loans totaled approximately $531 million in value.

106.    By 2022, Celsius's uncollateralized institutional loans ranged from $1.3 billion to $1.96 billion in value and accounted for 34-48% of the company's entire institutional loan portfolio.

107.    Mashinsky knew that Celsius had uncollateralized loans throughout this time period—including when he was publicly stating otherwise.  For example, beginning in 2020, Celsius's Risk Committee, of which Mashinsky was a member, held regular weekly or bi-weekly meetings in which high-level Celsius executives reviewed the loan portfolio, including the percentages of the portfolio that were uncollateralized.

108.    In addition to the information discussed at regular Risk Committee meetings, there were internal discussions about the falsity of Mashinsky's public statements regarding collateralized loans.  In an exchange on the messaging application Slack, a Celsius executive told a senior employee at the company:  "I just told [Mashinsky] that the number [of unsecured loans] is increasing and the overall ratio of collateral with institutions is going down. . . . I will talk to him.  I said this numerous times."  The executive's message was prompted by a false statement Mashinsky had made about the company's loan portfolio in a November 6, 2020 AMA.

109.    By the spring of 2021, Celsius executives identified false statements about collateralized loans as part of the AMA Editing Process.  The AMA Editing Process began just after an April 30, 2021 AMA in which a Celsius employee falsely stated, "So I would say a majority of our loans, almost 100% of them are fully collateralized, with other assets right."  A Celsius executive later told Mashinsky in an email, "I think the april 30th AMA video needs to be removed until the changes have been made," citing this misrepresentation.

110.    Nevertheless, two weeks later, at a May 14, 2021 AMA, Mashinsky echoed the April 30 misstatement by saying:  "These loans are collateralized.  This means the institutions

give Celsius assets or dollars to hold onto before we give out the digital assets.  This protects the community and keeps them whole."

111.     Mashinsky's May 14 statement was deleted as part of the AMA Editing Process, at the direction of a Celsius executive.  That executive recognized the falsity of Mashinsky's public statement and noted:  "It is crucial to: delete this section of the AMA, AND remove the curated video explanation from EVERYPLACE on the internet."

112.     Mashinsky continued making similar false statements up until the time that Celsius halted withdrawals in 2022, despite having regularly attended Risk Committee meetings that discussed the large number and percentage of Celsius's unsecured institutional loans.

### 2.     Celsius and Mashinsky Falsely Represented That Celsius Did Not Engage in Directional Trading

113.     Additionally, Mashinsky and Celsius made several false statements regarding the company's trading activities.  As an example, Mashinsky tweeted on September 29, 2020, "Celsius does not trade or take long or short positions with customer coins."

114.     In reality, Celsius engaged in risky directional trading (trading that bets on the value of an asset or security going up or down) that led to large undisclosed losses for the company.

115.     For instance, in 2019, Mashinsky shorted the crypto asset Bitcoin (BTC) on behalf of Celsius and using Celsius investor funds.  A senior executive at Celsius ultimately unwound the positions, which resulted in a $15 million loss for the company.  It also, in part, led Celsius to create a "Recovery Committee," which contemplated liquidating or selling Celsius to cover the loss.  Celsius's financial condition only stabilized after a $20 million capital raise in August 2020.

116.    In 2021, Mashinsky and Celsius continued falsely to represent that the company did not engage in directional trading.  For example, in a July 31, 2021 interview with a crypto asset news outlet, Mashinsky said:  "Celsius does not bet on assets.  It's not like we invest in Bitcoin and hope it's going to go up.  Our job is to create yield, to create interest."

117.    Contrary to Mashinsky's statement, Celsius was engaged in directional trading in Bitcoin (BTC) and another crypto asset called Ether (ETH), sometimes following instructions provided by Mashinsky himself.

118.    As an internal Celsius document dated February 2, 2022 explained:  "Directional trading was a widespread practice before September 2021 and was known and accepted by senior management, including risk.  It was presented and discussed in ExCo, ALCO, and R[isk] C[ommittee] and there is extensive supporting evidence."

119.    A Celsius employee even told Mashinsky in a private message on January 24, 2022:  "Hi Alex – on our call last evening, I agreed with reducing the directional trades, but we've effectively replaced them with another set of directional trades, so I want to share with you that I have concerns with the approach we're taking."

120.    Despite Mashinsky's knowledge of and involvement in directional trading, he continued falsely to state publicly that Celsius did not engage in directional trading.  For instance, Mashinsky stated in a December 31, 2021 AMA:  "We don't trade. We only earn yield on top of—we stick to—we don't trade around positions.  We don't buy and sell Bitcoin.  We don't do any of those things that people think will do better than the index."

121.    In response to that statement, a Celsius executive noted internally that Mashinsky's statement that the company does not engage in directional trading was "false."

122.    In an April 13, 2022 CNBC interview, Mashinsky again falsely stated:  "We are what you call a delta-neutral strategy . . . .  Celsius doesn't bet on the market going up or down."

123.    One of Celsius's Account Managers made a similar false statement in a May 27, 2022 AMA.  A Celsius executive responded internally:  "This is untrue and misrepresents material risk factors associated with yield accounts."

### 3.    Celsius and Mashinsky Falsely Represented That Celsius Had No Leverage

124.    Celsius and Mashinsky also falsely stated that the company had no leverage.  In general, leverage is a ratio used to measure the amount of debt a company has relative to its capital.  Mashinsky compared Celsius favorably to banks, which he characterized as having significant leverage.

125.    At least one Celsius executive attempted to get Mashinsky to stop saying that the company did not have leverage.  The executive told Mashinsky to avoid making such statements and provided Mashinsky with data demonstrating that Celsius had leverage in similar ratios as banks.

126.    Nevertheless, Mashinsky continued to state publicly that Celsius did not have leverage.  For example, in a February 22, 2022, Twitter Spaces interview, Mashinsky stated:

> Oh, yeah, we don't have leverage . . . . Banks are leveraged on average, either 10 times or 20 times depending on the balance sheet.  And Celsius doesn't have any leverage, right? I mean, we, we have a little bit of leverage, because we sometimes lend out the collateral we get from third parties.  So it's maybe again, instead of 1.0, it's 1.2 or something like that.

127.    Mashinsky's statement was identified by Celsius employees as part of the AMA Editing Process as among "a selection of recent misrepresentations made by Alex [Mashinsky] and other Celsius reps on Twitter Spaces AMAs."

128.     As late as May 27, 2022, just weeks before Celsius halted investor withdrawals, Mashinsky falsely claimed that "we don't offer any leverage, and we don't let you even if you want to inside our app."  This statement was also identified as "incorrect" as part of the AMA Editing Process.

### 4.     Celsius and Mashinsky Falsely Represented That 80% of Celsius's Revenue Is Returned to Investors

129.     Celsius and Mashinsky repeatedly represented that Celsius paid 80% of its revenue back to investors.

130.     Beginning as early as March 7, 2019, Mashinsky made this promise in an interview with NASDAQ:  "Celsius network enables you to lend them to someone else, and you get to keep 80%."

131.     From March 2019 through early 2022, Celsius and Mashinsky consistently stated that Celsius gave 80% of the company's revenue back to investors in the form of interest.

132.     For example, on September 19, 2019, Celsius tweeted:  "Our rates are funded by our own revenue - 80% of our total revenue goes back to our depositors as weekly interest income payments."

133.     Mashinsky made the same claim in an AMA on May 15, 2020:  "We have to earn the money, give you 80%, and use the 20% to deliver everything you're asking from us every day."

134.     Celsius reiterated the claim as well in a tweet on April 27, 2021:  "How is it possible that we offer up to 7% APY on crypto, asks @CNBC.  The answer is simple:  we give 80% of our revenue back to the community.  #UnbankYourself."

135.     These representations were false.  Celsius paid investors in the Earn Interest Program an interest rate that was rarely, if ever, tied to the revenue received by the company or

its performance.  Prior to July 2021, Celsius did not even have a formal policy on setting the interest rates paid to Earn Interest Program investors.

136.   Mashinsky and other executives at Celsius feared losing investors as a result of the company lowering the interest rates it paid participants in the Earn Interest Program.  As a result, Celsius largely set its interest rates in order to attract and retain investors rather than the basing them on the returns it was able to receive from its business activities.

137.   Contrary to Defendants' many representations that 80% of revenue is paid to investors, Celsius consistently paid out *more* in interest than the company generated in revenue.

138.   Despite the publicized growth of the company, Celsius did not experience a meaningful period of profitability during the 2018 through 2022 time period.

139.   This fact was well-known to Celsius executives, including Mashinsky.  For example, in February 2021, Celsius's CFO sent Mashinsky a financial document showing that for 2020, Celsius paid out $45.7 million in interest (called "rewards") but generated only $42.7 million in income.  In other words, more than 100% of Celsius's revenue in 2020 went to pay purported interest to investors.

140.   In 2021, Celsius paid 23% more in interest to investors in the Earn Interest Program than it generated in revenue.

141.   Mashinsky and Celsius's senior leadership were aware that the company's payout ratio was above 100%, with one executive noting Celsius was "basically using user balances to pay user rewards."

142.   In July 2021, Celsius implemented a formal policy on setting interest rates.  Even under that policy, however, the interest rate that Celsius paid to investors in the Earn Interest Program was not directly tied to the company's revenue.

143.    Mashinsky knew of the policy and that the purported interest payments to investors in the Earn Interest Program did not represent 80% of the company's revenue.

144.    Even after the formal policy was instituted, and in the face of clear information about the disparity between revenue earned and interest payouts, Mashinsky continued to claim falsely that the company was paying 80% of its revenue back to investors.

145.    Celsius's unsustainable and undisclosed practice of paying more than 80% of its revenue back to investors had the effect of making the company's operations appear more stable and profitable than they really were.

**B.      Defendants Misrepresented Celsius's Financial Success**

146.    From the time of the CEL ICO in March 2018 until days before Celsius halted customer withdrawals off its platform, Celsius and Mashinsky publicly misrepresented significant financial events and the financial condition of the company.

**1.      Celsius and Mashinsky Falsely Represented the Amount Raised by the CEL ICO**

147.    Celsius falsely stated on numerous occasions that the CEL ICO was fully subscribed at $50 million, when in fact only approximately $32 million had been sold.

148.    Even before the ICO had closed, Celsius began falsely to claim success, announcing in March 2018:  "We're excited to announce that we've raised over $42 million of our $50 million hard cap."

149.    Mashinsky falsely claimed in a May 17, 2018 YouTube interview that the CEL ICO was fully subscribed:  "We just closed our [ICO] round about a month ago, we raised $50 million."  In a July 25, 2018 Coin Central interview, Mashinsky similarly claimed:  "[I]t's funny because our ICO raised over $50 million."

150.    These misrepresentations continued until March 2019, when Mashinsky falsely stated in a March 13, 2019 YouTube video:  "We did an ICO, we raised $52 million in March."

151.    The fact that the CEL ICO fell short of its goal of $50 million and raised only $32 million was well-known to Mashinsky and other Celsius executives at the time they made the misrepresentations.

152.    Indeed, Celsius and Mashinsky sought to conceal the fact that the CEL ICO was not fully funded at $50 million.  On March 29, 2018, shortly after the CEL ICO closed, Mashinsky agreed to purchase the 117 million unsold CEL (worth $18 million) himself, entering into a token sale agreement with Celsius through a company in his name called AM Ventures Holdings, Inc.

153.    The token sale agreement between Celsius and Mashinsky and the sale of CEL to Mashinsky were not disclosed to investors and Mashinsky continued to state publicly that Celsius had raised $50 million.  In addition, the sale was never completed, Mashinsky never purchased the CEL or provided the $18 million to Celsius, and the unsold CEL remained in Celsius's possession.

154.    Celsius employees were aware that the representations about the ICO being fully funded were false, and that Celsius investors would care about this misrepresentation.

155.    In a March 1, 2019 internal communication, a Celsius employee stated:  "The public believes that the ICO was fully funded and all tokens purchased.  If they find out now that there were unsold they will be upset."

156.    Likewise, in a June 3, 2020 Slack exchange, Celsius employees discussed whether the unsold CEL should be moved back into the Celsius Treasury where it would be visible to Celsius investors.  When asked whether Celsius investors would care, one of the employees

responded:  "Yes, they would absolutely care . . . ou[r] 117M from old ICO stake into the Treasury would change the whole structure of how the ICO was designed—the community would be very angry."

157.    At least one Celsius executive admonished Mashinsky, telling him to stop misrepresenting the amount of CEL sold during the ICO.  In an attempt to prevent Mashinsky from making a misrepresentation about a different capital raise, the executive wrote to Mashinsky on July 23, 2020:  "This mistake was already made by us after the ICO (we didn't raise $50M but we claimed we did.)."  The executive wrote about Mashinsky's false statements to another executive:  "I need your help in making sure he [Mashinsky] doesn't continue saying wrong things.  This has gotten us into trouble time and time again and it's not healthy."

### 2.    Celsius and Mashinsky Falsely Represented the Number of Active Users on Celsius's Platform

158.    Celsius and Mashinsky falsely touted the number of users on the company's platform as another indicator of Celsius's purported success.

159.    Celsius generated, and Mashinsky received, internal data on a weekly basis that showed the number of investors using Celsius's platform.  According to Celsius's own data, in July 2021, the cumulative number of users who had invested crypto assets with Celsius since the Earn Interest Program launched three years earlier was between 200,000 and 300,000 users.

160.    Despite the company's own data, Mashinsky stated in a July 31, 2021 interview with a crypto asset news outlet:  "Today, there are 50 or so companies that are copying what Celsius has created, which is great. . . . But Celsius is by far the largest leader, with over US$15 billion in assets, and close to a million customers are earning yield on our platform."

161.    In an April 13, 2022 interview with CNBC, Mashinsky falsely claimed:  "We aggregate 1.7 million users, right, pool them together . . . ."

162.    In a May 13, 2022 AMA, Mashinsky again falsely stated:  "We have millions of customers . . . ."

163.    An internal report dated May 28, 2022 that Mashinsky received showed that, contrary to his representations, only about 500,000 users had ever invested crypto assets with Celsius.

164.    Celsius employees marked Mashinsky's May 13, 2022 statement regarding the number of investors for removal as part of the AMA Editing Process because it was false.

### 3.    Celsius and Mashinsky Falsely Represented That Celsius Had Not Experienced Any Loan Defaults

165.    In 2021 and 2022, Mashinsky also falsely represented that Celsius had not experienced any defaults on the loans made by the company.  At the time he made these statements, Mashinsky and other Celsius executives knew the statements were false.

166.    For example, Mashinsky stated in a July 31, 2021 interview with an online news outlet:  "So, in Celsius we have 350 institutional counterparties.  None of them defaulted on a loan. . . .  We had thousands of margin calls but none of our counterparties has defaulted."

167.    Similarly, in an October 15, 2021 AMA, Mashinsky said:  "[A]mazingly after four years, we've never had an institution who took a loan from us that did not pay back . . . ."

168.    Mashinsky repeated the false representation again in a November 12, 2021 AMA:  "In four years we have not had a single institution default either not pay the interest or not return the collateral or the . . . coins that we lent them."

169.    In a January 7, 2022 Real Vision interview, Mashinsky reiterated:  "We had tens of thousands of margin calls but not a single counterparty defaulted, uh, on their loans.  So, we only lend to really responsible institutions."

170.     Mashinsky knew before making these statements that Celsius had experienced defaults by institutional borrowers totaling millions of dollars.

171.     In February 2021, Mashinsky and a Celsius executive discussed over email the default involving an institutional borrower, with Mashinsky commenting:  "It used to be a $3m problem now it is a $17m problem . . . .  We were supposed to get 200 BTC back.  Never happened."

172.     In 2021, a Celsius executive asked Mashinsky to stop saying that Celsius never had an institutional loan default because such statements were not accurate.

173.     The fact that Celsius had experienced institutional defaults was also discussed at Celsius's internal ALCO meetings, which Mashinsky regularly attended.  At a July 14, 2021 ALCO meeting, for example, the company identified "bad debts," including failed loans to two institutional borrowers.

174.     As of June 23, 2022, the net value of Celsius's loan defaults was approximately $208 million.

**4.     Celsius and Mashinsky Falsely Represented Celsius's Financial Condition During the Spring 2022 Crypto Asset Crash**

175.     Between May 7 and 9, 2022, certain crypto assets offered by another company experienced a sharp decline in value.

176.     At that time, Celsius sought to reassure its investors by making a number of public statements about the company's healthy financial condition.

177.     On May 11, 2022, Celsius released the following statement on Twitter: "As part of our responsibility to serve our community, @CelsiusNetwork implemented and abides by robust risk management frameworks to ensure the safety and security of assets on our platform. All user funds are safe.  We continue to be open for business as usual."

31

178.    On the same day, Mashinsky similarly tweeted that "Celsius has not experienced any significant losses and all funds are safe."

179.    In reality, Celsius was in dire financial shape even before May 2022.  Contrary to the company's and Mashinsky's public statements of reassurance, Mashinsky and other company executives were communicating internally about the significant financial losses Celsius was experiencing.

180.    On April 26, 2022, Mashinsky and two other senior executives at Celsius communicated internally about the significant financial losses Celsius was suffering.

181.    One of the senior executives stated:  "While none of us want to incur any more large losses, we are hemorrhaging $7.5mm pre-tax losses each week.  We need to figure out how to scale up our deployment efforts."

182.    On May 2, 2022, Mashinsky and other senior executives attended a Celsius Board meeting in which they discussed Celsius's significant financial losses and struggling business model.  The presentation for that meeting showed overall pre-tax losses of $811 million for 2021 and $165 million in losses in the first quarter of 2022.

183.    On May 9, 2022, just two days before Celsius and Mashinsky released their reassuring statements on Twitter, a Celsius executive called the company a "sinking ship."

184.    On May 12 and 25, 2022, that same Celsius executive wrote in Slack exchanges that "there is no hope . . . there is no plan," and that Celsius's business model "is fundamentally broken."

185.    Another employee bluntly stated in an internal message on May 21, 2022:  "We don't have any profitable services."

186.    Mashinsky knew Celsius's continued viability was in doubt.  A Celsius executive told Mashinsky in a May 25, 2022 message:  "[W]e will continue to dig a deeper hole for many months – and the asset/liability gap is much more severe now with lower balances."

187.    Despite understanding that Celsius's financial condition was bleak, Celsius and Mashinsky continued falsely describing the company as having a strong financial condition and outlook.

188.    On June 1, 2022, Mashinsky participated in an interview segment titled, "What's up with Celsius?" and again made several statements that sought to reassure Celsius's investors. Mashinsky stated:

> Yes, so not just that they [investors' assets] are safe, but we provided anyone that wanted to withdraw, partially or fully, there were no problems. . . .  No other exposure that I know . . . . Celsius continues to do what it did for the last five years. . . . Our community is resilient.  We have billions of dollars in liquidity.

189.    On June 7, 2022, Celsius posted a blog post entitled, "Damn the Torpedoes, Full Speed Ahead."  In this blog, Celsius referenced "misinformation and confusion" around Celsius, and claimed that the company "remain[s] deeply optimistic about the future."

190.    Just days before the June 7 blog post, however, a "business outlook" presentation was circulated among Celsius executives, including Mashinsky, that reflected Celsius's true financial state and grim future outlook.

191.    The presentation started out:  "Celsius has been consistently losing money and is facing an erosion in the capital position as well as liquidity constraints.  The current business model is not financially sustainable."

192.    The presentation also noted the need for a $1 billion capital raise.

193.    On June 10, 2022, Mashinsky continued to reassure investors in an AMA: "Celsius has billions in liquidity, right, and we provide immediate access [to] anyone who needs

access to it, to the liquidity.  That includes institutions and people that want to get their loans

back and people who are taking loans."

194.    Contrary to Mashinsky's assurances, Celsius's own historical liquidity model

showed significant liquidity issues with Ether (ETH) and Bitcoin (BTC).

195.    In the days leading up to the June 10 AMA, including on the very same day,

Mashinsky and another Celsius executive actively discussed last resort options to save the

company.  These options included possibly selling Celsius to another large crypto company or

getting a high interest rate loan from that company.

196.    When Mashinsky expressed hesitation about engaging with the other company,

the Celsius executive responded:  "Don't think we have that luxury."

197.    Mashinsky privately acknowledged, "CEL continues to crash.  If we don't do

anything we will have massive withdrawals."

198.    Two days after Mashinsky's June 10 AMA, Celsius halted customer withdrawals

from its platform.

**C.     Defendants Misrepresented the Safety of Customer Assets on Celsius's
         Platform**

199.    Celsius and Mashinsky also made many false representations regarding the

overall safety of assets deposited by investors on the company's platform, examples of which

appear below.

**1.     Celsius and Mashinsky Falsely Touted Celsius's Regulatory
         Compliance**

200.    In 2021 and 2022, Mashinsky falsely touted Celsius's regulatory compliance to

reassure investors that investing in CEL and the Earn Interest Program was safe.

201.    For example, during a December 1, 2021 interview with KITCO News in Florida, Mashinsky misrepresented that "states and other regulators have looked into Celsius, they all came back thumbs up, there's no problem, we didn't find anything . . . ."

202.    In a December 12, 2021 article with Barron's Online, Mashinsky was quoted as saying:  "The regulators looked into us and said these guys know what they're doing."

203.    On April 15, 2022, Mashinsky made another statement on regulatory compliance in an AMA:  "Here's clarity from different regulators, both from states and federal regulators, telling you the user that there's no issue, there's no legal issues at least with what Celsius provides."

204.    Mashinsky had no basis to make these statements.

205.    In fact, in May 2021, several state securities regulators contacted Celsius regarding concerns about the unregistered securities offering of the Earn Interest Program.

206.    These regulatory activities were known within Celsius.  An October 7, 2021 email from a senior Celsius executive to all Celsius employees, including Mashinsky, even explained that Celsius had received requests for information from several state regulators.

### 2.    Celsius and Mashinsky Misrepresented That Investors' Assets Were Insured

207.    Celsius and Mashinsky also misled investors by assuring them assets invested with Celsius were safe by falsely telling investors that their assets were insured.

208.    In an April 8, 2022 AMA, Mashinsky stated:  "The highest insurance in the industry right? 750 million, right? . . . highest level security, highest level insurance, together with Celsius highest yield in the market, and that's like win-win for everybody."

209.    Contrary to Mashinsky's statement, Celsius did not have an insurance policy for investors' crypto assets.

210. In fact, the FAQs on the Celsius website in this time period stated, "Celsius does not have an insurance policy. Fireblocks, our custodian, provides insurance on digital assets held by Celsius. However, we generate interest rewards by deploying assets. When these assets are out of Celsius's control, they can't be insured by such insurance."

211. The Celsius Terms of Use, as of April 8, 2022, further stated: "[Y]our Celsius Account is not a checking or savings account, and it is not covered by insurance against losses."

## IV. Defendants Manipulated the Market for CEL to Inflate the Value of Celsius and Induce Others to Buy CEL

### A. As Part of an Ongoing "Buy Back" Program, Celsius and Mashinsky Purportedly Bought CEL to Fund Interest Payments to Investors

212. Celsius and Mashinsky undertook a secret plan to increase artificially CEL's market price by buying more CEL than they were admitting publicly.

213. In the summer of 2018, Celsius began purchasing CEL on the secondary market and used CEL it purchased to pay interest (or rewards) to investors who chose to earn their rewards in CEL. In the AMAs and other public statements, Celsius and Mashinsky regularly described Celsius's CEL purchases as being tied specifically to CEL rewards payments.

214. For example, Mashinsky stated: "[J]ust in 2021, we purchased $421 million worth of CEL token . . . Obviously most of this is . . . to pay the community, to pay the people who earn in CEL."

215. In another example, Mashinsky stated: "[T]he piece of how much we buy CEL has nothing to do with Celsius. Celsius does not decide how many CEL tokens to buy, and then how many of them to burn [i.e., retire from circulation]. You guys decide."

216. In reality, Celsius's CEL purchases greatly exceeded the purchases needed to make interest payments to investors, which Celsius and Mashinsky concealed from investors.

**B.  Celsius, at Mashinsky's Direction, Bought More CEL to Support the Price of CEL and Induce Additional Purchases of CEL**

217.    By the end of October 2019, the price of CEL had dropped to $0.05 per token, which was well below the $0.30 per token price from the ICO in early 2018.

218.    Celsius, at Mashinsky's direction, took action to support the price of CEL. Specifically, Celsius and Mashinsky wanted the CEL price to mirror Celsius's user and deposit activity.  In other words, if Celsius was growing in terms of users and deposits, then Celsius and Mashinsky wanted the price of CEL also to be increasing.

219.    Internally, Mashinsky was vocal about his desire for Celsius to do everything in its power to boost the price of CEL.

220.    In EXCO meetings, for example, Mashinsky frequently stated that Celsius had to get the price of CEL up.

221.    In one email, Mashinsky remarked that "[o]ur job is to protect CEL" and "the only way we loose [sic] if CEL price drops a lot and people get nervous and keep selling.  We can protect against that scenario."

222.    In November 2019, Celsius disclosed that it was performing a discrete buyback (that was limited in amount) outside the purchases the company needed to pay interest.

223.    In 2020, however, Celsius had developed a plan focused on increasing the price of CEL by expanding buybacks that the company did not disclose publicly.

224.    An internal memo stated as its "Main Thesis" to increase the price of CEL, "[w]e rise and fall with CEL" and that "[t]he more customer[s] use CEL & the more it's worth, the more worth we can extract out of it (for example using it for interest payments instead of our [c]ash)."

37

225.    The internal memo described a plan to raise the price of CEL.  The plan included "[v]alue based repurchase examples" in which Celsius would repurchase certain percentages of the CEL it sold via OTC "on a case to case basis dependent on our Cash Needs."  The memo also detailed a plan that would give "value to CEL" through Celsius's increased trading activity:

- The more CEL we sell OTC
- The more CEL we can repurchase
- The more attractive CEL markets look like
- The more CEL buy orders we receive
- In the end: The more our Treasury is worth
- The less # of CEL we need to sell for the same $ value we want to raise with these OTC sales

226.    Significantly, the memo noted that implementing the proposed plan would cause "Official CEL Buybacks" (i.e., the ones that had previously been publicly disclosed) to "lose relevance" because "[e]very OTC sale of CEL is a potential 'Buyback like situation[s].'"

227.    Through the OTC desk, Celsius account holders could sell their CEL back to Celsius or purchase additional CEL.  Because these transactions occurred on the Celsius platform, they were only reflected in internal records and not on the blockchain or to other users of the Celsius platform.

228.    In a May 14, 2020 email regarding "CEL OTC," Mashinsky provided specific instructions about the company buying additional CEL more quickly if the price of CEL fell lower.

229.    In response to Mashinsky's request, a Celsius employee proposed an approach that included keeping some of the proceeds from OTC sales for profit for Celsius, while using the remainder of the proceeds to support the price of CEL and replenish the company's Treasury. Under this proposal, Celsius would sell CEL via the non-public OTC desk, and use the proceeds to turn around and repurchase CEL via public means and boost its price.  This plan also served,

as a Celsius employee wrote, to "support[] the CEL price[,] to stabilize CEL and make it even

more attractive for even more OTC buyer."

230.    Celsius's expansion of CEL purchases was significant both in terms of volume

and dollars.  Throughout 2020 and 2021, Celsius purchased far more CEL than was needed to

pay interest and far more than the additional buybacks it disclosed.  The company purchased

over $700 million worth of CEL (gross) but only used $160 million worth of CEL for interest

payments and to burn (i.e., retire from circulation).

231.    In fact, from May 2019 through July 2022, less than 50% of Celsius's purchases

of CEL on crypto asset platforms was used to fund interest payments to investors or burn.  That

percentage decreases when Celsius's OTC purchases are included.

232.    A Celsius employee regularly updated Mashinsky on the market for CEL and

Celsius's purchases and sales of CEL, but neither the company nor Mashinsky disclosed the full

extent and nature of these additional buybacks of CEL to investors.

233.    For example, on December 10, 2021, a Celsius employee informed Mashinsky

that in 2021, Celsius purchased 23 million CEL over what was needed to pay investors—

comprising nearly half of the company's CEL net purchases for the year.  Nevertheless,

Mashinsky continued stating publicly that Celsius's purchases of CEL were determined by the

amount of rewards the company owed to investors.

234.    In addition to engaging in undisclosed purchases, Celsius strategically structured

and timed its CEL purchases to have the greatest impact on the market.

235.    First, Celsius conducted its CEL transactions such that its purchases of CEL were

primarily through crypto asset trading platforms where the fact that CEL was actively being

purchased would be visible.  At the same time, Celsius concealed most of its sales through OTC

transactions via the Celsius platform that did not result in visible blockchain transactions.  This reflected Mashinsky's belief that buying in the market increased demand for CEL.

236.    Second, Celsius timed purchases of CEL to coincide with AMAs or news announcements, and the company sized its CEL purchases to maximize the price impact on CEL. As one Celsius employee described the process:  "when we start buying actively with good size & good timing we (the FED of CEL) made a huge positive impact."

237.    Celsius also went to great lengths to protect the price of CEL from falling. Among other things, the company used bots to monitor the price and utilized resting orders to prevent the price from dropping below certain thresholds.

238.    The plan to boost the price of CEL by Celsius and Mashinsky had the desired impact.  As Celsius increased its CEL purchases, the price of CEL increased.  From January 3, 2020 to December 31, 2021, CEL's price rose from $0.15 to $4.37.  This represented a 2,900% increase in the price of the crypto asset.

239.    Senior Celsius employees, including Mashinsky, knew that Celsius bought CEL in excess of interest payments to affect the price of CEL and attract more CEL buyers and Earn Interest Program investors.

240.    For example, in an email chain that included Mashinsky, a Celsius executive explained that "a big part of" Celsius's CEL purchases was "supporting the CEL market." Another Celsius employee similarly noted that Celsius purchasing CEL "supports the CEL price to stabilize CEL and make it even more attractive for even more OTC buyer[s]" and that "the more CEL drops the more we buy it back."  The Celsius employee also stated that "the higher" the price of CEL "the more people understand Celsius is a legit company and will get customers."

241.    Internally, Mashinsky directly expressed his desire to raise the price of CEL.  On October 30, 2021, in an internal message with a Celsius employee, Mashinsky stated:  "Every day we have all time record new users joining Celsius yet CEL [p]rice is going down."  He went on to write:  "The price will not take care of itself if everyone will just get scared and sell."

242.    The employee was equally direct in response:  "We're not just sitting and watching the price.  We're on it all week . . . .  The issue is that people are selling and no one is buying except for us.  The main problem was that the value was fake and was based on us spending millions (~$8M a week and even more until February 2020) just to keep it where it is.  This week we spent 'only' $4M (on top of the rewards) and the price is still going down."

243.    Mashinsky understood that increasing the price of CEL was vital to attracting more investors.  He persisted in trying to develop strategies to inflate the price of CEL and wrote to a Celsius employee on October 30, 2021:  "Everyone knows what these tokens are and want to buy them because they think price is going up. . . . You saw that none of our announcements which had fundamentals like Burn or funding or investment in mining moved CEL so we need to change our tackticks [sic]."

244.    Others within Celsius also recognized that Celsius and Mashinsky were trying to prop up CEL.  As one employee succinctly stated in a Whatsapp message on December 21, 2021:  "we artificially create CEL volume."

245.    Artificially increasing the value of CEL helped Celsius and Mashinsky mask the company's financial difficulties and other failures.  For example, on August 10, 2021, Celsius estimated its net equity position as approximately $1.02 billion when it included the CEL in its Treasury in the calculation.  Without the CEL in the company's Treasury, Celsius's net equity position was negative $789 million—a swing of nearly $1.8 billion.

41

C.     **Celsius and Mashinsky Concealed the Extent and Purpose of Celsius's Buybacks**

246.     Despite public assurances of transparency, Celsius and Mashinsky concealed the company's plan of artificially boosting the price of CEL.

247.     As one Celsius employee stated in March 2021:  "The last 3-4 months we bought always more CEL than what we pay as interest per week but we did not buy it for the interest payments, that was just what we told the community."

248.     Another employee described one instance of Celsius buying CEL this way:  "It's like FBI.  The job we do is not to be noticed."

249.     At times, when Celsius was unable to make CEL purchases itself to boost the price, Mashinsky used his own accounts to purchase CEL in consultation with Celsius's traders. In one such instance, an employee told Mashinsky, "you saved the day."

250.     Mashinsky knew the value of CEL was, as one employee stated, "fake" and was actually based on Celsius spending millions of dollars to maintain its price.

251.     Nevertheless, Mashinsky continued falsely to inform the investing public that Celsius's CEL purchases were to pay interest.

252.     Mashinsky made false statements such as Celsius's CEL purchases were "to pay the community" and Celsius buys CEL based on "how many people chose to earn in CEL."

253.     Mashinsky also falsely claimed in a March 19, 2021 AMA:  "It really comes down to how many buyers versus how many sellers. . . . So we obviously want CEL token to go higher in price but we don't control it.  It's not like we are the invisible hand that controls the pricing here or anything like that."

254.     Celsius's and Mashinsky's false statements led investors to believe incorrectly that the market reflected the fair price of CEL.  It did not.

### D.    Celsius and Mashinsky Benefited from the Artificially Inflated CEL Price

255.    Celsius and Mashinsky benefited financially from the inflated price of CEL.

256.    First, with an inflated price of CEL, Celsius was able to portray Celsius's financial position favorably, using the Treasury's CEL holdings as a growing asset on the company's balance sheet to offset its significant liabilities.

257.    Second, Celsius also traded strategically to reap profits from the inflated prices it created.  In at least some circumstances, Celsius bought through crypto asset trading platforms only 25-50% of the CEL it needed for OTC sales and, as one employee stated in an internal message, "put the other 50-75% into our pocket as Cash."  In other words, Celsius kept the proceeds from sales at inflated prices as profit.  Celsius was thus able simultaneously to sell additional CEL at a higher price and inflate its own value as a company.

258.    Third, Mashinsky was the largest holder of CEL other than Celsius, and he personally profited from its artificially inflated price.

259.    Like other CEL holders in the Earn Interest Program, Mashinsky earned weekly interest in CEL, which only increased as the price of CEL went up.

260.    Moreover, Mashinsky withdrew and sold large amounts of CEL, despite regularly assuring investors that he was only buying CEL.  In fact, Mashinsky was selling CEL at the same time he encouraged investors to "HODL," or "hold on for dear life," their own CEL.

261.    For example, Mashinsky tweeted on December 10, 2020:  "[j]ust bought 35,000 @CelsiusNetwork CEL Token on @UniswapProtocol at $2.19."  In other words, Mashinsky publicly disclosed that he had purchased approximately $75,000 in CEL.

262.    Mashinsky did not tweet, however, that in the same month he sold approximately 1.2 million CEL tokens totaling approximately $4.6 million.

263.    In fact, Mashinsky appears to have publicized the single instance in which he bought CEL in December 2020, while he quietly sold CEL numerous times during the month.

264.    Available records indicate that from 2018 through May 2022, Mashinsky withdrew over 86 million CEL worth over $200 million from his accounts on Celsius's platform. Mashinsky later sold many of these tokens.

**V.    Celsius's Collapse**

265.    By January 2022, the company's financial condition was dire.

266.    Despite increasing prices for crypto assets in 2021 and the fact that Celsius received a capital infusion of approximately $700 million in late 2021, the company was struggling financially as a result of its failing business model and growing expenses.

267.    In total, Celsius incurred pre-tax losses of approximately $811 million in 2021.

268.    In early 2022, Celsius executives identified core actions for the company to take to improve its condition, including reducing Earn Interest Program interest rates and eliminating riskier deployment activities.

269.    Mashinsky was aware of the company's poor financial condition, and he acknowledged in a May 20, 2022 email to a senior executive at the company "that the current business model is not sustainable and that our capital position is making things worse."

270.    By the end of the first quarter of 2022, Celsius had incurred additional pre-tax losses of approximately $165 million.

271.    Between May 7 and May 9, 2022, the Terraform Labs crypto asset called UST started rapidly losing value, which caused its companion crypto asset, LUNA, to fall from a value of approximately $80 to pennies by May 12, 2022.

272.    Celsius incurred $17.8 million in direct losses associated with the collapse of UST

and Luna and also experienced increased withdrawal requests from investors on the Celsius platform, resulting in a serious liquidity problem for the company.

273. In May 2022 alone, net withdrawals from Celsius totaled $1.8 billion.

274. During the last two weeks of May 2022, Mashinsky withdrew a large percentage of his Bitcoin (BTC), Ether (ETH), and the crypto asset known as USDC held in accounts at Celsius, totaling approximately $8 million.

275. Specifically, Mashinsky withdrew approximately 90% of the combined Bitcoin (BTC) and Wrapped Bitcoin, 81% of the Ether (ETH), and nearly 100% of all non-CEL related crypto assets that he held at Celsius.

276. By comparison, Mashinsky withdrew approximately 3% of the CEL tokens in his accounts during that same period, totaling approximately $2 million.

277. During this time period, Celsius's total liabilities, including Celsius's CEL Treasury, exceeded its total assets by approximately $1 billion.

278. Privately, a number of senior leaders of the company expressed grave concerns about Celsius's viability and understood the company was facing an existential crisis. As one Celsius executive stated privately: "I'm sorry – why aren't we talking about the elephant in the room. [S]urvival? [L]iquidity[.] [H]ow many days we have left[.]"

279. On June 12, 2022, after failed attempts to secure additional capital and in the face of a renewed wave of withdrawals, Celsius halted all customer withdrawals, transfers, and swaps.

280. On July 13, 2022, Celsius filed for Chapter 11 bankruptcy.

281. At the time Celsius filed for bankruptcy, the company had approximately $1.2 billion more in liabilities than assets on its balance sheet.

## TOLLING AGREEMENTS

282.    In March and May 2023, Celsius signed tolling agreements with the SEC for the period February 22, 2023 through August 21, 2023.  In April 2023, Mashinsky signed a tolling agreement with the SEC for the period March 13, 2023 through June 11, 2023.

283.    Each tolling agreement specifies a period of time (a "tolling period") in which "the running of any statute of limitations applicable to any action or proceeding against [Defendants] authorized, instituted, or brought by . . . the [SEC] . . . arising out of the [SEC's investigation of Defendants' conduct], including any sanctions or relief that may be imposed therein, is tolled and suspended. . . ."

284.    Each tolling agreement further provides that Defendants and any of their agents or attorneys "shall not include the tolling period in the calculation of the running of any statute of limitations or for any other time-related defense applicable to any proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-related defenses."

## COUNT I – FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]
### (Against All Defendants)

285.    Paragraphs 1 through 284 are realleged and incorporated herein by reference.

286.    Defendants, acting with scienter, in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, employed a device, scheme, or artifice to defraud.

287.    By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C.

§ 77q(a)(1)].

## COUNT II – FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and (3)]
### (Against All Defendants)

288.     Paragraphs 1 through 284 are realleged and incorporated herein by reference.

289.     Defendants, acting knowingly, recklessly, or negligently in the offer or sale of

securities and by the use of means or instruments of transportation or communication in interstate

commerce or by the use of the mails, directly or indirectly, (a) obtained money or property by

means of untrue statements of material fact or by omitting to state material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not

misleading; and (b) engaged in transactions, practices, or a course of business which operated or

would have operated as a fraud or deceit upon the purchaser.

290.     By reason of the foregoing, Defendants, directly and indirectly, have violated and,

unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15

U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III – FRAUD

### Violations of Section 10(b) of the Exchange Act
### and Rules 10b-5(a), (b), and (c) thereunder
### [15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5]
### (Against All Defendants)

291.     Paragraphs 1 through 284 are realleged and incorporated by reference herein.

292.     Defendants, acting with scienter and in connection with the purchase or sale of

securities and by the use of any means or instrumentality of interstate commerce or by use of the

mails or any facility of any national securities exchange, directly or indirectly, (a) employed a

device, scheme, and artifice to defraud; (b) made untrue statements of material fact or omitted to

state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or a course of business which operated or would have operated as a fraud or deceit upon sellers, purchasers, or prospective purchasers of securities.

293.    By engaging in the conduct described above, Defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5].

### COUNT IV – FRAUD

**Violations of Section 9(a)(2) of the Exchange Act**
**[15 U.S.C. § 78i(a)(2)]**
**(Against All Defendants)**

294.    Paragraphs 1 through 284 are realleged and incorporated herein by reference.

295.    By virtue of the foregoing, Defendants, directly or indirectly, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail, effected, alone or with one or more persons, a series of transactions in a security registered on a national securities exchange, a security not so registered, or in connection with a security-based swap or security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

296.    By engaging in the conduct described above, Defendants violated, and unless enjoined will continue to violate, Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

## COUNT V – UNREGISTERED OFFERS AND SALES OF SECURITIES

**Violations of Sections 5(a) and 5(c) of the Securities Act**
**[15 U.S.C. §§ 77e(a) and 77e(c)]**
**(Against All Defendants)**

297.    Paragraphs 1 through 284 are realleged and incorporated by reference herein.

298.    By virtue of the foregoing, without a registration statement in effect as to the Earn Interest Program, Defendants, directly and indirectly, (a) made use of the means and instruments of transportation or communications in interstate commerce or of the mails to sell securities through the use of medium of any prospectus or otherwise; (b) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; and (c) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

299.    By engaging in the conduct described herein, Defendant Celsius violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## PRAYER FOR RELIEF

The SEC respectfully requests that the Court enter a Final Judgment:

1.    Finding that Defendants committed the violations alleged in this Complaint;

2.    Permanently restraining and enjoining Defendants from engaging in conduct in violation of the following provisions:  Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)], Sections 9(a)(2) and 10(b) of the Exchange Act [15 U.S.C. §§ 78i(a)(2), 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

3.     Permanently prohibiting Defendant Mashinsky, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act;

4.     Permanently prohibiting Defendant Mashinsky, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t] and Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)], from (i) participating, directly or indirectly, in the purchase, offer, or sale of any crypto asset securities, or (ii) engaging in activities for the purposes of inducing or attempting to induce the purchase, offer, or sale of any crypto asset securities by others;

5.     Ordering Defendant Mashinsky to disgorge all ill-gotten gains in the form of any benefits of any kind derived from the illegal conduct alleged in this Complaint, plus pay prejudgment interest, pursuant to Sections 21(d)(3), (5), and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), (7)];

6.     Ordering Defendant Mashinsky to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] in an amount to be determined by the Court; and

7.     Ordering such other relief as this Court deems just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

## <u>JURY TRIAL DEMAND</u>

The SEC demands a trial by jury as to all issues that may be so tried.

Dated: July 13, 2023

Respectfully submitted,

/s/ Harry B. Roback
Harry B. Roback*
Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
Tel: (404) 942-0690
robackh@sec.gov

James P. Connor*
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Tel: (202) 551-8394
connorja@sec.gov

Attorneys for Plaintiff

*_Pending admission pro hac vice_

<u>Of Counsel</u>
Stacy L. Bogert
Pei Y. Chung
Randall D. Friedland
Christian J. Ascunce

Securities and Exchange
Commission